**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>TEDDER INDUSTRIES, LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 25-90805 (CML) |

---

**DECLARATION OF TOMMY MAGRATH IN SUPPORT OF**
**DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

---

Tommy Magrath makes the following *Declaration in Support of the Chapter 11 Petition and First Day Pleadings* (the "***Declaration***") filed by Tedder Industries, LLC, the debtor and debtor-in-possession (the "***Debtor***") in the above-styled bankruptcy case (the "***Chapter 11 Case***").

1.        My name is Tommy Magrath. I am the Debtor's President. In my position, I have personal knowledge and am familiar with the Debtor's business affairs, day-to-day operations, books and records, and financial condition. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the Debtor's operations and financial condition, my own reasonable inquiry, and/or my discussions with the Debtor's other officers, directors, and advisors, including professionals at Vartabedian Hester & Haynes LLP ("***VHH***"). I am over the age of 18, and I am authorized to submit this Declaration on behalf of the Debtor.  If called to testify, I would testify competently to the facts set forth in this Declaration.

---

[1] The last four digits of the Debtor's federal tax identification number are 7652. The location of the debtor' service address is: 4411 W Riverbend Ave, Post Falls, ID 83854-8150.

2.      On December 8, 2025 (the "***Petition Date***"), the Debtor filed a voluntary petition (the "***Petition***") for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Court***"). The Debtor filed various motions and pleadings seeking certain "first day" relief (later defined as the First Day Pleadings) to minimize any disruption that filing the Chapter 11 Case may have on its operations. I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of this Chapter 11 Case and in support of the Petition and the First Day Pleadings.

3.      Along with this Declaration, the Debtor filed the following motions (collectively, the "***First Day Pleadings***")[2]:

   a. *Debtor's Emergency Motion for Entry of an Order Authorizing (I) Continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, (III) Continued Use of Existing Business Forms, and (IV) the Waiver of the 11 U.S.C. § 345(b) Deposit and Investment Requirements* (the "**Cash Management Motion**");

   b. *Emergency Motion of the Debtor for Interim and Final Orders (I) Authorizing the Debtor to Use Cash Collateral; (II) Providing Adequate Protection to Agent; (III) Granting Liens and Providing Superpriority Administrative Expense Claims; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "***Cash Collateral Motion***");

   c. *Debtor's Emergency Motion for Order (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Compensation, Employee Benefits and Other Employee Obligations and (B) Continue Paying Compensation and Benefits Programs in the Ordinary Course of Business; (II) Authorizing All Banks to Honor Reimbursement of Employee Obligations; and (III) Granting Related Relief* (the "***Wages Motion***");

   d. *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Prepetition Claims of Critical Vendors, and (II) Granting Related Relief* (the "***Critical Vendors Motion***");

   e. *Debtor's Emergency Motion for Entry of an Order (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (B) Approving the*

---

[2] Capitalized terms used but not described herein shall have the meaning ascribed to such terms in the applicable First Day Pleading.

2

*Debtor's Proposed Adequate Assurance of Payment for Future Utility Services, (C) Approving the Debtor's Proposed Procedures for Resolving Adequate Assurance Requests, and (D) for Related Relief* (the "**Utilities Motion**");

f.  *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Maintain Insurance Coverage Obtained Prepetition and Pay Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Modify, Extend, Purchase, Cancel, and Enter Into New Insurance Policies, and (C) Continue to Pay Brokerage Fees, and (II) Granting Related Relief* (the "**Insurance Motion**");

g.  *Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "**Taxes Motion**"); and

h.  *Debtor's Emergency Motion for Entry of an Order (A) Authorizing the Debtor to Maintain and Administer Its Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (B) for Related Relief* (the "**Customer Programs Motion**").

4.  I am generally familiar with the contents of each First Day Pleading and believe that the relief sought in each pleading allows the Debtor to, among other things, fulfill its duties as debtor-in-possession and minimize the disruption to the Debtor's business operations that may be caused by the commencement of this Chapter 11 Case. Additionally, I believe that the relief requested in the First Day Pleadings is important to ensure that the Debtor can continue to deliver necessary products and services to its customers.

5.  To familiarize the Court with the Debtor and the relief the Debtor seeks early in this Chapter 11 Case, this Declaration is organized into two sections. **Section I** provides an overview of the Debtor's operations and the events that led to this Chapter 11 Case. **Section II** sets forth the relevant facts in support of each of the First Day Pleadings filed in connection with this Chapter 11 Case, which the Debtor believes are critical to administering this Chapter 11 Case and preserving and maximizing the value of the Debtor's Estate.

## I.      OVERVIEW OF THE DEBTOR

### (A)   Description of the Debtor's Business

6.      The Debtor is a Texas limited liability company with its principal place of business in Idaho. Main Street Equity Interests and MSC Equity Holdings LLC (together, the "***Main Street Entities***"), which together hold the majority of the Debtor's equity interest, are subsidiaries of Main Street Capital Corporation, the Debtor's secured lender. Main Street Capital Corporation is domiciled in Texas and Maryland.

7.      The Debtor operates a consumer-brand manufacturing business within the firearms and accessories market, specializing in American-made, injection-molded gun holsters. Its products are distributed through multiple sales channels including institutional purchasers, business-to-business partners, and direct-to-consumer platforms. The Debtor operates in the marketplace as Alien Gear Holsters ("***Alien Gear***").

8.      Alien Gear was founded in 2010 by Thomas Tedder. After a poor experience with a purchased holster, Tedder designed his own. Starting as a small operation in a kitchen and shed, the company rapidly grew into a prominent brand in the firearms accessories industry. Known for its innovative hybrid leather-and-polymer holsters and modular designs, Alien Gear built its reputation on comfort, quality, and affordability for concealed carry users. Over time, the company expanded its product offerings to include various carry styles and now supplies holsters to U.S. military branches, international militaries, defense organizations, and law enforcement agencies.

9.      To maintain and grow its operations over the years, the Debtor took a $23.3 million secured loan from Main Street Capital Corporation, consisting of a $21 million term loan and a $2.3 million revolving line of credit.

**(B)   Corporate Governance**

10.     The Debtor is governed by a board of three managers and the corporate members holding all of the Debtor's voting equity interest.  The three mangers are Jesse E. Morris, Todd A. Leitgeb, and Thomas Tedder.  The three members are Main Street Equity Interests, Inc., MSC Equity Holdings, LLC, and TI Holdings, LLC.  As mentioned above, the Main Street Entities hold the majority of the Debtor's equity interest and are affiliated with the Debtor's secured lender. A copy of the Debtor's organizational structure is attached hereto as Exhibit A.

**(C)   The Debtor's Prepetition Capital Structure**

11.     As of the Petition Date, the Debtor had approximately $20.55 million in aggregate principal amount of funded debt obligations outstanding, consisting of the following:

| Prepetition Indebtedness | Principal Amount Outstanding | Lien Priority and Collateral |
|---|---|---|
| Secured Term Loan | $19,000,000.00 | Substantially all of the Debtor's assets. |
| Revolver | $1,553,000.00 | Substantially all of the Debtor's assets. |
| Total | $20,553,000.00 | |

12.     On August 31, 2018, the Debtor, as borrower, entered into that certain *Loan Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Loan Agreement***") with Main Street Capital Corporation, as both the administrative agent and collateral agent (in both capacities, the "***Agent***") and the lenders party thereto from time to time (the "***Lenders***"), providing for a senior secured term loan in an original aggregate principal amount of $20.5 million.

13.     On October 11, 2018, the Debtor requested a new senior secured revolving line of credit of up to $1,500,000 (the "***Revolver***") pursuant to the first amendment to the Loan Agreement. On August 30, 2021, the Debtor (i) borrowed an additional $500,000 of term loans under the Loan Agreement and (ii) received access to an additional $500,000 in commitments

under the Revolver pursuant to the third amendment to the Loan Agreement. On October 29, 2021, the Debtor received access to an additional $300,000 in commitments under the Revolver pursuant to the fourth amendment to the Loan Agreement. As of the Petition Date, including all outstanding and accrued interest, approximately $25.05 million of obligations under the Loan Agreement are outstanding, consisting of approximately $23.08 million in term loans and $1.97 million under the Revolver.

**(D)   Events Leading to Chapter 11**

14.     I believe that the Debtor has a promising product with significant name value in its marketplace. Unfortunately, the Debtor's debt level is far more than its value at this time, and it's unable to service its loan. The Debtor intends to immediately start a sale process and pursue potential purchasers to maximize the value of its IP and assets, including its trade name Alien Gear.  Importantly, the Debor has the support of its secured lenders and majority equity holder to pursue a sale transaction. The Debtor hopes that the fresh start offered by a sale pursuant to section 363 of the Bankruptcy Code will make the Debtor an attractive prospect for potential purchasers.

**II.     Relevant Factual Background for First Day Pleadings**

**(E)   Cash Management Motion**

15.     As of the Petition Date, the Debtor's Cash Management System (defined below) employed a total of five (5) bank accounts and one (1) money market account (collectively, the "***Bank Accounts***"). The Debtor's Bank Accounts reside at First Interstate Bank (the "***Bank***"). The Bank is headquartered in Montana, which is Region 18 of the U.S. Trustee Program. The Bank is an authorized depository in Region 18.

16.     Below sets forth each of the Bank Accounts, the account number (last four digits only), and a description of the purpose of the account.

| Account Number | Purpose |
|---|---|
| XXXXX5118 | Deposit Account for Electronic Commerce Transactions |
| XXXXX5167 | Main Operating Account |
| XXXXX5316 | Restricted Cash Account |
| XXXXX5456 | Payables Account |
| XXXXXXXXX9344 | Deposit Account for Institutional and Check Deposits |
| XXXXXXXXX3882 | Money Market Savings Account |

17.     The Debtor manages its cash receipts, transfers, and disbursements through the Bank Accounts. In doing so, the Debtor routinely deposits, withdraws, and otherwise transfers funds to, from, and between the Bank Accounts by various methods including check, wire transfer, automated clearing house transfer, and electronic funds transfer. The Debtor processes large numbers of transactions through the Cash Management System as described below. The Debtor maintains current and accurate records of all transactions processed through the Cash Management System.

18.     Additionally, the Debtor has a secured loan from MSC. In part, MSC has secured its loan by collateralizing the Debtor's cash. The Debtor, MSC, and the Bank entered a Deposit Account Control Agreement (the "*DACA*") collateralizing the Bank Accounts. Closing these accounts would burden a critical business relationship with MSC—the Debtor's largest creditor, secured creditor, and likely DIP lender if a loan becomes necessary during the pendency of this Chapter 11 Case.

### *(i)     The Debtor's Cash Management System*

19.     Prior to the Petition Date and in the ordinary course of business, the Debtor utilized a relatively streamlined cash management system (the "*Cash Management System*"). The revenue accounts ending in 5118 and 9344 receive payments from payment processing systems and institutional customers that maintain wire information or automatic payment information. Changing these accounts would disrupt customer relationships and could harm operational

7

continuity. Cash is swept from the revenue accounts to the payable accounts ending in 5167 and 5456, which make payments to dozens of operational vendors and are set up for automatic payments. If the Debtor is forced to change bank accounts, all the payees would have to be recreated in a new bank account. The Debtor staffs its finance team leanly. Therefore, this would take a significant amount of time and resources from the Debtor's staff while the Debtor's staff needs to be focused on maintaining operational continuity. Moving payees could also create postpetition payment issues, causing immediate irreparable harm to the Debtor's postpetition reputation.

20.     Among other benefits, the Cash Management System permits the Debtor to accurately monitor cash availability and permits the Debtor to centrally manage and track the collection and transfer of funds, which reduces administrative burden and expense and maximizes interest income.

### (ii)     The Debtor's Business Forms

21.     In addition to the Cash Management System and Bank Accounts, the Debtor uses, in the ordinary course of its business, numerous business forms (including, but not limited to, checks, deposit slips, letterhead, contracts, purchase orders, and invoices) (collectively, the "**Business Forms**").

22.     Most of the Business Forms are printed on an as-needed basis from an electronic template. The Debtor requests that it be authorized to continue to use its preprinted Business Forms on a postpetition basis. The Debtor submits that it would be expensive, wasteful, and disruptive to the Debtor's business to destroy these forms and order new ones. Absent this relief, the estate will be required to bear a potentially significant expense that the Debtor believes is unwarranted,

without any meaningful corresponding benefit, and would unnecessarily distract the Debtor away from its efforts from administering this Chapter 11 Case.

    **(F)**    **Cash Collateral Motion**

        *(iii)*    *Agreed Use of Cash Collateral and Need for Adequate Protection*

23.    The Debtor intends to continue its operations in the ordinary course, seek authority to pay its prepetition obligations, and to continue to pay its postpetition obligations in the ordinary course. To maintain stable operations, the Debtor requires immediate access to liquidity in the Chapter 11 Case to, among other things, continue to maintain business relationships with its various vendors, suppliers, and payors, make payroll, satisfy working capital and operational needs, and fund this Chapter 11 Case. The Debtor has approximately $730,000.00 of cash on hand, all of which constitutes Cash Collateral. Pursuant to section 362(c)(2)(A) of the Bankruptcy Code, the Agent has consented to the Debtor's use of Cash Collateral in accordance with the terms and conditions set forth in the Cash Collateral Motion's proposed orders (the "***Cash Collateral Orders***") to enable the Debtor to continue its operations during this Chapter 11 Case. Without the use of Cash Collateral, the Debtor would suffer immediate and irreparable harm and would likely be required to cease operations or, at a minimum, the Debtor's inability to use Cash Collateral would disrupt the Debtor as a going concern and would otherwise not be in the best interests of the Debtor or its creditors.

24.    In exchange for the use of Cash Collateral, the Debtor has agreed to provide adequate protection of the Prepetition Liens and other Prepetition Collateral and a superpriority claim to the Agent on the terms set forth in the Cash Collateral Orders.

25.    I believe that the relief sought in the Cash Collateral Motion is fair, reasonable, and consistent with the Bankruptcy Code. Granting the Cash Collateral Motion will allow the Debtor

to continue to operate in the ordinary course while facilitating this Chapter 11 Case. Therefore, I believe the relief sought in the Cash Collateral Motion is in the best interests of the Debtor, its estate, its residents, and all stakeholders and should be approved.

**(G)** **Wages Motion**

26.     The Debtor's workforce includes approximately 108 employees that are paid on either a bi-weekly basis (*i.e.*, every two weeks) or a bi-monthly basis (*i.e.*, once on the 15th day of each calendar month and again on the last day of each calendar month). These wages are calculated in arrears. The last paycheck received by the Debtor's workforce covered the pay period of November 16, 2025, through November 29, 2025.

27.     The Debtor's workforce also includes Non-Employee Contractors (as defined below) through Humanix Corp, a staffing agency ("***Humanix***"). As of the Petition Date, there are approximately 21 Non-Employee Contractors providing labor to the Debtor. Humanix invoices the Debtor each week in arrears. The next invoice is due December 15, 2025, which covers work completed from November 9 through December 6, 2025.

28.     By the Wage Motion, the Debtor seeks permission to: (i) pay employees for prepetition salaries and wages in the gross amount of $262,510.29; (ii) authorize the Debtor to pay approximately $35,576.93 in employment taxes and expenses associated with the employee's prepetition wages; (iii) pay premiums on health insurance covering the Debtor's employees for coverage for pre-petition periods in the approximate amount of $19,549.41; (iv) authorize the Debtor to pay approximately $85,638.52 to the Non-Employee Contractors (defined below); (v) permit employees to use, postpetition, paid time off, holidays, and sick leave days that they accrued prepetition; and (vi) authorize the Debtor to pay a Christmas bonus of $250 to 108 non-insider employees.

29.     In sum, the Debtor seeks authority to pay the following:

| Description of Prepetition Workforce Obligations | Approx. Prepetition Amount Outstanding |
|---|---|
| Employee Salaries | $153,435.76 |
| Employee Wages | $79,854.15 |
| Non-Employee Contractor Wages | $85,638.52 |
| Holiday/PTO | $29,220.38 |
| Health Insurance Premiums | $19,549.41 |
| Employee Benefits (*i.e.,* 401K, Disability, Workers Compensation Insurance) | $6,941.27 |
| Payroll Taxes | $20,186.24 |
| Payroll Expenses | $8,430.70 |
| Holiday Bonus | $31,000.00 |
| TOTAL: | $434,256.43 |

30.     I believe that any delay in paying prepetition employee obligations will adversely impact the Debtor's relationship with its workforce and will irreparably impair the employees' morale, dedication, confidence, and cooperation in the chapter 11 process. At this early stage in the Chapter 11 Case, the Debtor simply cannot risk the substantial damage to its business that would inevitably result from a decline in the employees' morale and cooperation attributable to the Debtor's failure to pay wages, salary, benefits, and other similar items. Furthermore, many of the Debtor's employees live paycheck to paycheck, and any disruption in their payment will have a substantial adverse effect on their lives and families.

31.     In addition, I believe that all unpaid, prepetition compensation is entitled to priority treatment in accordance with Bankruptcy Code sections 507(a)(4) in light of the fact that none of the Debtor's workforce are owed more than $17,150.

32.     For these reasons, and for the reasons and legal arguments set forth in the Wage Motion, I believe the relief sought in the Wage Motion should be approved.

   **(H)     Critical Vendors Motion**

33.     Alien Gear's products can be the difference between life and death for its customers. Thus, the Debtor operates in highly specialized and competitive industry. The uniqueness and competitiveness of the gun holster industry, coupled with the highly regulated

11

environment in which U.S. military branches, international militaries, defense organizations, and law enforcement agencies must operate, leaves holster companies such as the Debtor, which serve these industries, with few alternatives with respect to certain manufacturing vendors and service providers (collectively, "***Manufacturing Vendors***"). If a Manufacturing Vendor increases its prices or refuses to do business, the Debtor may be unable to switch to a different vendor until the Debtor's customer has obtained approval to use the Alien Gear's holster with a different vendor's part. Moreover, some vital products important to the public's health, safety, and welfare are custom-made by sole-source or limited-source vendors who cannot be replaced without extraordinary expense or delay. In certain cases, the loss of a key Manufacturing Vendor would force the Debtor to lose a significant portion of its customers.

34.     Alien Gear's consumer sales, which make up a significant portion of the Debtor's revenue and profit, are driven by an elaborate online eCommerce system that includes interconnected technology, advertising, and shipping vendors (collectively, "***eCommerce Vendors***"). If an eCommerce Vendor increases its prices or refuses to do business, the Debtor's eCommerce system may collapse, causing irreparable harm to the Debtor and immediate loss of large portions of consumer sales. Moreover, some of the eCommerce Vendors have created or service custom technology built for the Debtor and therefore cannot be replaced in the short term, and even in the long term without extraordinary expense or delay.

35.     Additionally, the Debtor's offices and some of its manufacturing facilities are at a property that was originally leased from, and owned by, the Debtor's founder, board member, and minority owner Thomas Tedder. The lease expired and the Debtor remains a month-to-month holdover tenant. The Debtor owes approximately $65,000 rent ("***Rent Expense***") for this property that became due on December 1, 2025. Significantly, the Debtor believes that the Rent Expense is

below market. The Debtor intends to remain at this property because, according to its business judgment, changing locations at this time would (a) cost the Debtor far more than the Rent Expense and (b) cause disruptions in manufacturing that would negatively impact production and customer service at a critical time for business continuity. The Debtor considered other office spaces, and any space that would satisfy the Debtor's needs would cost the Debtor more than the current space. Additionally, due to the Debtor's anticipated sale process, the Debtor, in its business judgment, does not think it wise to enter into a long-term postpetition lease.

36.     Due to the timing of the Debtor's freefall Chapter 11 Case, the Debtor could not process the scheduled payment for its December rent. The Debtor reached out to negotiate with Tedder regarding the missed payment, but Tedder has threatened to seek relief from the automatic stay for the Debtor's default of the monthly December Rent Expense. The Debtor's potential cost to litigate these issues would likely cost the Debtor and its estate far more than the Rent Expense, and the litigation would take the Debtor's time and resources away from focusing on the business's continuity. Accordingly, the Debtor has determined in its business judgment and with the consent of its secured lender to seek approval to pay the Rent Expense.

37.     Any material disruption to the Debtor's substantial vendor relationships and its current tenancy could have a catastrophic effect on its reputation among customers, its market share, the operations of its customers who each in turn serve the public, and ultimately the Debtor's ability to successfully emerge from this Chapter 11 Case as a going concern.

38.     To achieve uninterrupted and timely service to its customers, the Debtor relies on continuing access to, and relationships with, certain highly specialized or essential vendors and its landlord (the "***Critical Vendors***"). Without uninterrupted access to these goods and services, and

the smooth transition into its restructuring, the Debtor's operations and sales would be severely impaired and its customers impacted to the detriment of all.

39.     For this reason, the Debtor requests authorization to pay certain outstanding prepetition claims of the Critical Vendors (the "***Critical Vendor Claims***"), subject to the limitations set forth in the Proposed Order. Given the size, number, and scale of the Debtor's operations, the Debtor intends to use its discretion to pay only those Critical Vendor Claims that are critical to maintaining the Debtor's manufacturing and eCommerce system and provide the Debtor with favorable postpetition terms. The following table summarizes the estimated amounts outstanding for the Critical Vendor Claims that the Debtor requests authority to pay.

| Vendor Category | Estimated Remaining Prepetition Amount Due on Interim Order | Estimated Remaining Prepetition Amount Due on Final Order |
|---|---|---|
| Manufacturing Vendors -- Critical Vendor Claims | $175,000 | $110,000 |
| eCommerce Vendors -- Critical Vendor Claims | $210,000 | $80,000 |
| Rent Expense | $35,000 | $30,000 |
| | | |
| **Total Estimated Amount Requesting Authorization to Pay** | **$420,000** | **$220,000** |

40.     In the ordinary course of business, the Debtor deals with many providers of critical supplies and services that the Debtor depends on to serve its customers. Of particular importance are vendors irreplaceable due to geography, customer-mandated suppliers, proprietary or limited-source suppliers, and technical service providers with expertise specific to the Debtor's operations, products, and eCommerce system.

41.     Additionally, the Debtor has historically enjoyed favorable trade terms with certain of their Critical Vendors and believe that they would likely need to forego these favorable terms if they are forced to seek out new suppliers who may demand cash in advance or cash on delivery

during the pendency of this bankruptcy. Less favorable trade terms would negatively impact the value of the Debtor's estate.

42. The Debtor believes that jeopardizing its relationship with any of the entities identified as Critical Vendors would impose a severe strain on the Debtor's business operations and would likely result in significant revenue loss. Even a temporary interruption of the provision of the Critical Vendors' goods and services would impede the Debtor's operations, and the cumulative impact of such interruptions could have a catastrophic adverse effect on the Debtor's business and its ability to continue as a going concern. Such harm would likely far outweigh the aggregate amount of the Critical Vendor Claims, which is modest in comparison to the overall value of the Debtor's enterprise and the amount of its secured and unsecured debt.

43. Accordingly, I believe that the relief requested in the Critical Vendor Motion is in the best interest of the Debtor, its estate, and all other parties in interest and should be approved.

**(I)    Utilities Motion**

44. In the ordinary course of its business, the Debtor obtains, either directly or indirectly, electricity, natural gas, water, waste disposal, telecommunications, and other similar services (collectively, the "***Utility Services***") from several utility providers (individually, a "***Utility Provider***," and collectively, the "***Utility Providers***"). A nonexclusive list of the Utility Providers and their affiliates (the "***Utility Providers List***") that provide Utility Services to the Debtor as of the Petition Date is attached as Exhibit 1 to the Utilities Motion's proposed order.

45. The Debtor pays the Utility Providers, which are set forth in the Utility Providers List, directly as such payments come due (the "***Utilities Fees***"). The relief requested in this Motion is with respect to all Utility Services and related fees.

46.     On average, the Debtor pays approximately $14,378.68 each month for Utility Services, calculated as the historical average payment for the three months leading up to the Petition Date. Maintaining uninterrupted Utility Services is essential to the Debtor's ongoing business operations.

47.     Certain Utility Providers that supply the Debtor with Utility Services may discontinue services if (a) the Debtor fails to timely pay for the Utility Services or (b) the Utility Providers believe that the Debtor will not meet its payment obligations. Any discontinuance of Utility Services, even for a brief period, will jeopardize the Debtor's business operations and detrimentally effect the Debtor's ability to generate revenue as necessary for a successful reorganization. Accordingly, to ensure that the Debtor continues to have uninterrupted access to critical Utility Services, the Debtor seeks authority to continue to honor its utility obligations as they come due in the ordinary course of business on a postpetition basis, consistent with its prepetition conduct.

48.     As of the Petition Date, the Debtor estimates that there is approximately $11,725.22 owed to Utility Providers. To the best of the Debtor's knowledge, none of the Utility Providers hold deposits from the Debtor, and the Debtor is not in possession of any funds allocated for any prepayments for the Utility Services.

**(J)     Insurance Motion**

49.     By the Insurance Motion, the Debtor seeks authorization to (i) maintain existing insurance policies and pay all obligations arising therefrom, including Insurance Premiums (and the related Broker Fees), (collectively, the "***Insurance Obligations***") and (ii) renew, revise, extend, supplement, change, or enter into new insurance policies as needed in its business judgment. The Debtor further requests that financial institutions be directed to receive, process, honor, and pay

all checks presented for payment and electronic payment requests related to the Insurance Obligations, whether such checks were presented or electronic requests submitted prior to or after the Petition Date.

50.    Specifically, the Debtor maintains approximately nine (9) insurance policies (each, an "***Insurance Policy***" and, collectively, the "***Insurance Policies***") that are administered by seven (7) third-party insurance carriers (each, an "***Insurance Carrier***" and collectively, the "***Insurance Carriers***"). The Insurance Policies provide the Debtor with coverage for both general and commercial business risks, including, but not limited to, general liability, directors' and officers' liability, commercial property, marine cargo and inland transport, commercial automobile liability, cyber liability, crime and fidelity liability, foreign general liability, and foreign commercial property liability.[3] In addition, certain of the Insurance Policies provide layers of excess liability and umbrella coverage. A schedule of the Insurance Policies is attached as <u>Exhibit 1</u> to the Insurance Motion's proposed order. To protect and safeguard the Debtor's ongoing operations and ensure compliance with the United States Trustee Guidelines, it is critical that the Debtor be allowed to pay its Insurance Obligations on an ongoing and uninterrupted basis and renew, revise, extend, supplement, or change its existing Insurance Policies and enter into new insurance policies as needed in the Debtor's business judgment. The Debtor's failure to pay amounts related to the Insurance Obligations as and when they come due could result in attempts by the Insurance Carriers to terminate or decline to renew the Insurance Policies, or decline to enter into new insurance policies with the Debtor in the future. If any of the Insurance Policies are terminated,

---

[3] The Debtor also maintains numerous insurance policies with respect to, among other things, workers' compensation, employee health, disability, and life insurance benefits.  These programs are described, and relief is requested with respect to such programs, in the *Debtor's Emergency Motion for Order (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Compensation, Employee Benefits and Other Employee Obligations and (B) Continue Paying Compensation and Benefits Programs in the Ordinary Course of Business; (II) Authorizing All Banks to Honor Reimbursement of Employee Obligations; and (III) Granting Related Relief* filed contemporaneously herewith.

the Debtor could be exposed to substantial liability, to the detriment of all interested parties. Therefore, I believe that the relief requested in the Insurance Motion is in the best interest of the Debtor, its estate, and all stakeholders and should be approved.

      **(K)**    **Taxes Motion**

51.      Pursuant to the Tax Motion, the Debtor seeks authority to pay, in its sole discretion, (i) its Tax Service Provider and (ii) any Taxes and Fees (defined below) that accrued or that arose before the Petition Date that will become due during the pendency of this Chapter 11 Case to the applicable federal, state, and local taxing authorities (collectively, the "***Taxing Authorities***") in the ordinary course of business, without prejudice to the Debtor's right to contest the amounts and/or priority of any Taxes and Fees on any grounds they deem appropriate.

52.      In the ordinary course of business, the Debtor collects, withholds, and incurs taxes and fees, including, among others: (i) Property Taxes; (iii) Sales and Use Taxes; (iv) Franchise Taxes; (v) Regulatory and Other Taxes and Fees; (vi) Assessments and other fees as a result of Audits; and (vii) fees owed to Avalara (collectively, the "***Taxes and Fees***"). The Debtor pays or remits, as applicable, the Taxes and Fees to various governmental units (as that term is defined in section 101(27) of the Bankruptcy Code), including the Internal Revenue Service, and other Taxing Authorities, identified in Exhibit 1 to the Taxes Motion's proposed order.

53.      The Debtor generally, but not exclusively, pays and remits Taxes and Fees through checks and electronic transfers that are processed through their bank and other financial institutions or service providers.

54.      The Debtor pays the Taxes and Fees to the Taxing Authorities on a periodic basis, remitting them monthly, quarterly, semi-annually, or annually, depending on the nature and incurrence of a particular Tax or Fee. The Debtor seeks authority to pay and remit all prepetition

and postpetition obligations as they become due on account of the Taxes and Fees and Assessments (including any such obligations subsequently identified upon completion of an Audit or voluntary disclosure or otherwise determined to be owed), including: (i) Taxes and Fees that accrue or are incurred postpetition; (ii) Taxes and Fees that have accrued or were incurred prepetition but were not paid prepetition, or were paid in an amount less than actually owed; (iii) where payments of Taxes and Fees made prepetition by the Debtor were lost or otherwise not received in full by any of the Authorities; and (iv) Taxes and Fees incurred for prepetition periods that become due and payable after the commencement of this Chapter 11 Case, including as a result of Audits or voluntary disclosures, if any.  In addition, for the avoidance of doubt, the Debtor seeks authority to pay the Taxes and Fees for so-called "straddle" periods (*i.e.*, periods that include the Petition Date).[4]

55.     The Debtor estimates that $95,000.00 in Taxes and Fees are outstanding as of the Petition Date, as outlined below.[5] Of such amount, approximately $90,000.00 is due and payable within thirty (30) days after the Petition Date.

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date |
|---|---|---|
| **Property Taxes** | The Debtor incurs taxes related to certain real and personal property holdings (collectively, the "***Property Taxes***"), payable as such taxes come due in the ordinary course of business, on either a quarterly or annual basis, depending on the specific taxes. | $14,081.68 |

---

[4]  The Debtor reserves its right with respect to the proper characterization of any "straddle" Taxes and Fees and to seek any appropriate remedy including reimbursement of or reallocation of claims related to any portion of any payment made that ultimately is not entitled to administrative or priority treatment.

[5]  The Debtor cannot predict the amounts of any potential assessments that may result from Audits, if any. Accordingly, the Debtor's estimate of outstanding Taxes and Fees as of the Petition Date does not include any amounts relating to potential assessments.

| | | |
|---|---|---|
| **Sales and Use Taxes** | The Debtor collects and remits sales taxes, use taxes, and related taxes and fees (collectively, the "*Sales and Use Taxes*") to the Taxing Authorities in various jurisdictions in connection with the sale of goods or services in such jurisdictions. Sales and Use Taxes are general consumption taxes charged at either the point of purchase or sale for goods and services, which are usually set by the relevant Taxing Authority as a percentage of the retail price of the good or service purchased. Generally, the Debtor holds the Sales and Use Taxes and remits or pays such taxes monthly, quarterly, biannually, or annually. | $75,262.15 |
| **Franchise Taxes** | The Debtor makes payments to certain Taxing Authorities that collect franchise taxes and de minimis registration and other filing fees (collectively, the "*Franchise Taxes*") from the Debtor for the right to exist as a domestic corporation, for the privilege of doing business in a state as a foreign corporation, or for the actual conduct of carrying on of business in the state. The Franchise Taxes are generally measured by net income, gross receipts, capital stock, or some other measure of value and are payable either annually or quarterly. | $0[6] |
| **Regulatory and Other Taxes and Fees** | The Debtor pays Taxes and Fees related to their business operations and compliance with regulatory assessments, including permitting, licensing, business and occupation taxes, stamp taxes, commercial activity, and other operational fees (collectively, the "*Regulatory and Other Taxes and Fees*"), generally payable on a monthly or an annual basis, depending on the specific Tax or Fee. Regulatory and Other Taxes and Fees are typically paid in advance. | $0[7] |
| **Tax Service Provider** | The Debtor pays Taxes and Fees related to its use of a third-party tax service provider in the ordinary course of business. | $4,849.62 |
| | **Total:** | $94,193.45 |

56.     The Debtor also seeks authority to continue paying all Taxes and Fees on a postpetition basis in the ordinary course, whether arising before or after the Petition Date, to ensure uninterrupted business operations throughout the duration of the Chapter 11 Case. The continued payment of the prepetition Taxes and Fees on their normal due dates will ultimately preserve the

---

[6] The Debtor does not believe that any such fees are due but, out of an abundance of caution, seeks to pay such fees, if due, in the ordinary course of business.

[7] The Debtor does not believe that any such fees are due but, out of an abundance of caution, seeks to pay such fees if due in the ordinary course of business.

resources of the Debtor's estate. If such obligations are not timely paid, the Debtor's business operations may be suspended or the Debtor may incur additional fees, and the Debtor will be required to expend time and money to resolve these issues. In all cases, the Debtor's failure to pay the Taxes and Fees could have a material adverse impact on its ability to operate in the ordinary course of business.

### (L)   **Customer Programs Motion**

57.     The Debtor developed several incentives, discounts, promotions, and other programs in efforts to attract customers and maintain positive customer relationships. Specifically, the Debtor maintains (i) a program which allows its customers to purchase gift certificates and cards in various denominations (together, "***Gift Cards***"); (ii) thirty-day return, refund, and exchange policies with respect to both cash and credit purchases; and (iii) promotional markdowns, coupons, discount codes, deals, and other offers ((i)-(iii) collectively, the "***Customer Programs***"). As of the Petition Date, the Debtor believes the value of outstanding Gift Cards is approximately $24,453.00.

58.     The Debtor implemented each of the Customer Programs in the ordinary course of its business with the ultimate goal of promoting customer satisfaction, encouraging new purchases, and ensuring the Debtor remains competitive. To promote a smooth transition into this Chapter 11 Case, the Debtor must maintain customer loyalty and goodwill by honoring its obligations under its Customer Programs. Any delay or failure by the Debtor to honor its Customer Program obligations will irreparably harm customer relations and inevitably lower the overall sales and profitability of the Debtor. Accordingly, pursuant to the Customer Programs Motion, the Debtor seeks authority to honor any outstanding prepetition Customer Program obligations and to

continue honoring the Customer Programs in the ordinary course of its business on a postpetition basis without delay or disruption.

**III.**     **CONCLUSION**

59.     For all the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Pleadings and such other relief as is appropriate.

60.     Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED December 12, 2025.

*/s/ Tommy Magrath*
Thomas "Tommy" Magrath
President
Tedder Industries, LLC

**Exhibit A**

**Corporate Structure**

