**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **TEDDER INDUSTRIES, LLC,**[1] | **Case No. 25-90805 (CML)** |
| **Debtor.** | **Ref. Docket No. 194** |

**DECLARATION OF KEVIN DOOLEY IN SUPPORT OF AN ORDER (I) APPROVING THE ADEQUACY OF THE DEBTOR'S DISCLOSURE STATEMENT AND (II) CONFIRMING THE COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION OF TEDDER INDUSTRIES, LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Kevin Dooley, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am over the age of twenty-one (21) years and am competent to make this Declaration. I am the Chief Administrative Officer of Tedder Industries, LLC ("**Tedder**" or the "**Debtor**"), a Texas limited liability company with its principal place of business in Idaho. I assumed the role of Chief Administrative Officer of the Debtor in the spring of 2026 following six (6) years of involvement with the Debtor beginning in 2020.[2] In this capacity, I oversee administrative operations and wind down efforts of the Debtor in this Chapter 11 Case.[3] I am familiar with the Debtor's day-to-day operations, business and financial affairs, and books and

[1] The last four digits of the Debtor's federal tax identification number are 7652. The location of the Debtor's service address is: 4411 W Riverbend Ave, Post Falls, ID 83854-8150.

[2] Prior to this role, I spent approximately eight (8) years as Vice President on the Lower Middle Market deal with Main Street Capital Corporation. In that capacity, I was responsible for sourcing, evaluating and managing potential and current investments, working closely with portfolio companies and management teams to support value creation across a range of industries. Currently, I am the Co-Founder and CEO of First Stamps, a Houston-based company that provides digital newborn footprint scanning technology to hospital labor and delivery units, paired with a consumer keepsake product line.

[3] Capitalized terms used herein but undefined have the meaning provided for in the Plan, Solicitation Order, or Confirmation Order, as applicable.

records. Under the *Combined Disclosure Statement and Plan of Liquidation of Tedder Industries, LLC Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 194] (the "**Plan and Disclosure Statement**," the "**Plan**," or the "**Disclosure Statement**," as applicable), I am designated as the Wind Down Officer of the Debtor, and on the Effective Date, I will become the sole officer, member, and manager of the Liquidating Debtor. In my capacity as Chief Administrative Officer and designated Wind Down Officer of the Debtor, I am fully authorized to make this Declaration on behalf of the Debtor.

2. The facts set forth in this Declaration are based on my personal knowledge, my communications with the Debtor's professional advisors, and my knowledge of the Debtor's history, financial condition, and business operations and affairs. If called to testify, I could and would testify competently to the facts set forth herein.

## I. BACKGROUND

3. The Debtor operated a consumer-brand manufacturing business within the firearms and accessories market, specializing in American-made, injection-molded gun holsters. The Debtor's products were distributed through institutional purchasers, business-to-business partners, and direct-to-consumer platforms, and the Debtor operated in the marketplace under the trade name Alien Gear Holsters. The Debtor was founded in 2010 by Thomas Tedder and grew into a prominent brand known for innovative hybrid leather-and-polymer holsters and modular designs. The Debtor expanded to supply holsters to U.S. military branches, international militaries, defense organizations, and law enforcement agencies.

4. The Debtor's capital structure included a $23.3 million secured loan from Main Street Capital Corporation ("**Main Street**"), consisting of a $21 million term loan and a $2.3 million revolving line of credit under a Prepetition Loan Agreement dated August 31, 2018, with

Main Street as administrative and collateral agent. As of the Petition Date, approximately $25.05 million of obligations were outstanding under the Prepetition Loan Agreement. Main Street Equity Interests and MSC Equity Holdings LLC, subsidiaries of Main Street, together hold the majority of the Debtor's equity interest.

5. Despite promising product lines, the Debtor's debt level proved unsustainable. In addition, the Debtor became the subject of the *Silverman v. Tedder Industries, LLC* litigation (C.D. Cal. Case No. 24-cv-06989) (the "**California Litigation**"), a breach of contract suit in which a prejudgment writ of attachment was issued on September 18, 2025, in the amount of $1,152,116.00. The plaintiff executed on the writ', resulting in holds on accounts and creating an immediate overhang on liquidity that could not be resolved in the near term.

## II. THE BANKRUPTCY CASE AND SALE TO SAFARILAND, LLC

6. The Debtor commenced this Chapter 11 Case on December 8, 2025 (the "**Petition Date**"), styled as *In re Tedder Industries, LLC*, Case No. 25-90805 (CML), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**").

7. The Debtor retained Trinity River Advisors, LLC ("**TRA**") as its business broker and conducted an extensive sale process, including approximately 100 meetings with potential bidders, 8 meetings with management, and 4 site visits. Safariland, LLC ("**Safariland**") was designated as the stalking horse bidder on March 17, 2026, and the Court entered the order approving the sale on April 1, 2026 [Dkt. No. 156] (the "**Sale Order**"). The sale closed on April 7, 2026, with Safariland acquiring substantially all of the Debtor's assets for approximately $10.3 million in Cash. Safariland continued the Debtor's operations as a going concern and continued employment of the Debtor's former employees.

8. I submit this Declaration (this "**Declaration**") on behalf of the Debtor in support of entry of an order (i) approving the adequacy of the Disclosure Statement and (ii) confirming the Plan. The Plan provides for the liquidation and Wind Down of the Debtor after the Effective Date.

9. I have reviewed and am generally familiar with the terms and provisions of the Plan and the Disclosure Statement. With the Debtor's advisors, I was personally involved in the development of the Plan. I believe the Plan was proposed in good faith and for the legitimate and honest purposes of liquidating the Debtor's remaining assets, resolving outstanding Claims and Interests, and maximizing value for the Debtor's Estate and its creditors.

10. On July 29, 2026, the Bankruptcy Court entered the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Approving the Forms of Ballots and Notices in Connection Therewith, (V) Scheduling Certain Dates With Respect Thereto, and (VI) Granting Related Relief* [Dkt. No. 197] (the "**Solicitation Order**"). The Solicitation Order conditionally approved the Disclosure Statement and scheduled the final approval and Confirmation Hearing for September 8, 2026, at 1:00 p.m. (prevailing Central Time). The *Notice of Filing of Plan Supplement to the Combined Disclosure Statement and Plan of Liquidation of Tedder Industries, LLC Pursuant to Chapter 11 of the Bankruptcy Code* was filed on August 14, 2026 [Dkt. No. 204], and the *Notice of Filing of Amended Plan Supplement to the Combined Disclosure Statement and Plan of Liquidation of Tedder Industries, LLC Pursuant to Chapter 11 of the Bankruptcy Code* is being filed contemporaneously herewith (the document contained therein, as may be amended, modified, restated, or supplemented, the "**Plan Supplement**").

11. I understand that the Plan, the Disclosure Statement, the Solicitation Order, the notice of the Confirmation Hearing, the ballots, and related materials were served on creditors and other parties in interest in accordance with the Solicitation Procedures and the Bankruptcy Rules. The Voting Deadline and the Plan and Disclosure Statement Objection Deadline were August 27, 2026, at 4:00 p.m. (prevailing Central Time).

## III. THE PLAN COMPLIES WITH THE FOLLOWING CONFIRMATION STANDARDS AS SET FORTH IN THE BANKRUPTCY CODE

12. Based on my review of the Plan and Disclosure Statement and my discussions with the Debtor's legal advisors, I have been advised, and believe, that the Plan complies with the applicable provisions of the Bankruptcy Code and satisfies the confirmation standards described below.

### A. The Plan Complies with the Applicable Provisions (Section 1129(a)(1) and Section 1129(a)(2) of the Bankruptcy Code).

13. I have been advised by counsel and believe that both the Plan, and the Debtor, as proponent of the Plan, have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Procedures, as required by sections 1129(a)(1) and 1129(a)(2) of the Bankruptcy Code.

14. Sections 1122 and 1123(a)(2)-(4) of the Bankruptcy Code: In addition to unclassified Administrative Expense Claims, DIP Claims, Priority Tax Claims, and Professional Fee Claims, Article III of the Plan designates five (5) Classes of Claims and Interests: Class 1 (Other Priority Claims); Class 2 (Secured Lender Claim); Class 3 (General Unsecured Claims); Class 4 (Watts Claim); and Class 5 (Existing Interests). The Plan specifies that Classes 2, 3, and 4 are Impaired and entitled to vote, while Classes 1 and 5 are Unimpaired and deemed to have accepted the Plan. Article III of the Plan specifies the treatment of each Class of Claims. I believe that the Claims and Interests within each Class are substantially similar, that each Claim or Interest

within a Class receives the same treatment, and that the classification scheme does not place similar Claims or Interests into separate Classes for an improper purpose.

15. Section 1123(a)(5) of the Bankruptcy Code: Based on my review of the Plan, I believe it provides adequate means for implementation. Among other things, the Plan provides for the vesting of all Remaining Assets in the Liquidating Debtor on the Effective Date; the appointment of the Wind Down Officer to administer the Wind Down of the Debtor; the funding of the GUC Pool in the amount of $100,000.00 from the Secured 'Lenders' Plan consideration for distribution to Holders of Allowed General Unsecured Claims; the transfer of the Watts Assets (Watts Patents and Watts IP) to satisfy the Watts Claim pursuant to the Watts Stipulation; the reconciliation and distribution of remaining Claims; and the taking of all necessary actions to consummate the Plan.

16. Section 1123(a)(6) of the Bankruptcy Code: It is my understanding that section 1123(a)(6) of the Bankruptcy Code does not apply to the Plan because the Plan provides for the dissolution of the Debtor. Pursuant to the Plan, the Existing Interests shall remain outstanding solely to the extent necessary to accomplish the Wind Down. Accordingly, section 1123(a)(6) is inapplicable.

17. Section 1123(a)(7) of the Bankruptcy Code: The Plan provides that I, Kevin Dooley, will serve as the Wind Down Officer and will become the sole officer, member, and manager of the Liquidating Debtor on the Effective Date. [My identity, qualifications, and compensation terms are disclosed in the Plan and the Plan Supplement.] I believe these selections are consistent with the interests of creditors and equity holders and with public policy.

18. Section 1123(a)(8) of the Bankruptcy Code: This provision applies only in a case in which the debtor is an individual. Tedder Industries, LLC is a limited liability company, and therefore section 1123(a)(8) is not applicable to the Plan.

19. Section 1123(b)(1) of the Bankruptcy Code: As indicated above, Article III of the Plan describes the treatment for each Class of Claims and Interests. The Plan provides that Classes 2, 3, and 4 are Impaired, and that Classes 1 and 5 are Unimpaired.

20. Section 1123(b)(2) of the Bankruptcy Code: Article VII of the Plan addresses the treatment of Executory Contracts and Unexpired Leases. The Plan Supplement filed on August 14, 2026 [Dkt. No. 204], as amended on September 3, 2026, includes the Schedule of Assumed Executory Contracts and Unexpired Leases. Any Executory Contract or Unexpired Lease not assumed or the subject of a pending motion to assume will be deemed rejected. I believe this treatment is consistent with the Debtor's business judgment and provides a clear mechanism for addressing any remaining contract obligations.

21. Section 1123(b)(3)-(6) of the Bankruptcy Code: The Plan incorporates a series of compromises and settlements, including the GUC Pool funded by the Secured Lenders and the Watts Stipulation for the transfer of the Watts Assets. The sale of the Debtor's assets to Safariland was previously approved by the Court and is reflected in the Plan. The Plan also provides for the Wind Down Officer to prosecute and settle Causes of Action on behalf of the Liquidating Debtor. The Plan does not include any provision inconsistent with the applicable provisions of the Bankruptcy Code.

**B. The Plan's Releases, Exculpation, and Injunction Provisions are Appropriate.**

*(i)* *Debtor's Releases*

22. I understand that Article IX.D.1 of the Plan provides for the Debtor, on the Effective Date and unless expressly preserved by the Plan, to release, acquit, discharge, and dismiss Claims and Causes of Action against the Released Parties. The Released Parties include (i) the Debtor and its Estate; (ii) the Liquidating Debtor and its Estate; (ii) the DIP Lenders; (iv) any Professional; (v) the Secured Lenders; and (vi) with respect to (i) through (v), such Entities' Related Parties. The releases do not release obligations under the Plan or documents implementing the Plan, and are subject to carveouts for fraud, willful misconduct, gross negligence, and professional liability under Texas Disciplinary Rules of Professional Conduct Rule 1.08(g).

23. The Debtor's Releases are a necessary and integral element of the Plan and the Debtor's liquidation efforts. The releases reflect the contributions and cooperation of the Released Parties throughout the Chapter 11 Case, including the Secured Lenders' agreement to fund the $100,000 GUC Pool from their own Plan consideration and to waive their right to recovery from the GUC Pool, notwithstanding that the $10.3 million in sale proceeds did not cover the $25.05 million Secured Lender Claim. The releases and the Plan Injunction are material consideration for those contributions and are necessary to the consummation of the Plan. Further, it is my understanding that the releases and Plan Injunction are consensual and made in exchange for, and are supported by, fair, sufficient, and adequate consideration provided by the parties receiving such releases. Furthermore, I understand that the release and exculpation provisions in the Plan are the product of arm's-length negotiations, were a critical inducement for parties to support the Plan, and constitute a good-faith settlement and compromise of the Claims released.

*(ii)* *Releasing Parties Releases*

24. Article IX.D.2 of the Plan provides for consensual releases by the Releasing Parties. The Releasing Parties Releases include an opt-out mechanism, ensuring that any Holder of a Claim or Interest that does not wish to grant such releases may elect not to do so. In addition, I understand that the release provisions of the Plan were conspicuous and emphasized with boldface type in the Plan, the Disclosure Statement, the Combined Hearing Notice, the Ballots, and the notices of non-voting status and Opt-Out Forms. I believe the consensual nature of these releases, combined with the opt-out mechanism, makes them fair, reasonable, and appropriate under the circumstances.

*(iii)* *Exculpation*

25. Article IX.C of the Plan provides that the Debtor is the sole Exculpated Party and will be exculpated from Claims and Causes of Action relating to the Chapter 11 Case, the Plan, or the administration of the Plan after the Effective Date, except for Claims or Causes of Action arising from fraud, willful misconduct, gross negligence, or professional liability under Texas Disciplinary Rules of Professional Conduct Rule 1.08(g).

26. I believe the Exculpation is appropriate and necessary to protect the Debtor as estate fiduciary, which acted in good faith to administer the Estate, develop the Plan, and implement the Wind Down. The Exculpation is appropriately limited to conduct connected to the Chapter 11 Case, the Plan, and post-Effective Date Plan administration, and it does not protect conduct determined to constitute fraud, willful misconduct, or gross negligence.

*(iv)* *Plan Injunction*

27. Article IX.B of the Plan establishes the Plan Injunction. As of the Effective Date, Holders of Claims against or Interests in the Debtor that arose before the Effective Date will be permanently enjoined from commencing or continuing actions to collect those Claims or Interests,

creating, perfecting, or enforcing any Lien or encumbrance against the Debtor or the Liquidating Debtor, or taking action inconsistent with the Plan. The Liquidating Debtor will have authority to enforce the Plan Injunction.

28. I believe the Plan Injunction, the Debtor's Releases, the Releasing Parties Releases, and the Exculpation are integrated provisions that provide finality, protect the value created by the Plan's compromises and settlements, and permit the Liquidating Debtor to carry out the Wind Down without continued litigation over Claims. These provisions are consistent with the Plan's compromise and settlement provisions and are necessary to implement the Plan.

**C. The Principal Purpose of the Plan is Not the Avoidance of Taxes, thereby Satisfying Section 1129(d) of the Bankruptcy Code.**

29. It is my understanding that a plan may not be confirmed if, upon request of a governmental unit, the Bankruptcy Court finds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of § 5 of the Securities Act of 1933. I am not aware of any such request in this Chapter 11 Case. The principal purpose of the Plan is to liquidate the Debtor's remaining assets, resolve Claims and Interests, and maximize value for the Debtor's Estate and its creditors, not to avoid taxes or the Securities Act. I therefore believe the Plan satisfies section 1129(d).

**D. The Plan has Been Proposed in Good Faith (Section 1129(a)(3) of the Bankruptcy Code).**

30. I believe the Plan was proposed in good faith and not by any means forbidden by law. The Plan reflects the Debtor's legitimate and honest purposes of liquidating the Debtor's remaining assets following the sale to Safariland, providing an orderly Wind Down, funding the GUC Pool to provide distributions to Holders of General Unsecured Claims, and providing the greatest practical recovery to creditors. The Plan and the related documents were developed with

the Debtor's advisors and in light of the interests of the Debtor's creditors and other parties in interest.

**E. The Plan Provides for the Payment of Fees and Expenses in Compliance with Section 1129(a)(4) of the Bankruptcy Code.**

31. I believe that payments made or to be made by the Debtor for services, costs, and expenses in connection with the Chapter 11 Case, including Professional Fee Claims, have been approved by, or are subject to approval by, the Bankruptcy Court. I further believe that the payments and treatments provided under the Plan are reasonable and appropriate in this Chapter 11 Case.

**F. The Plan Identifies the Wind Down Officer (Section 1129(a)(5) of the Bankruptcy Code).**

32. In accordance with the Plan, I, Kevin Dooley, will serve as the Wind Down Officer and will become the sole officer, member, and manager of the Liquidating Debtor on the Effective Date. My identity, qualifications, and compensation are disclosed herein, in the Plan and the Plan Supplement. The Liquidating Debtor will indemnify me except for bad faith, gross negligence, willful misconduct, or criminal conduct. I believe that my identity, experience, and affiliations are consistent with the interests of creditors and equity holders and with public policy.

**G. The Plan Does Not Contain Rate Changes (Section 1129(a)(6) of the Bankruptcy Code).**

33. The Debtor's business does not involve the establishment of rates subject to approval by a governmental regulatory commission. Accordingly, the Plan does not propose any change to a regulated rate and section 1129(a)(6) is not implicated.

**H. The Plan is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7) of the Bankruptcy Code).**

34. In connection with the Plan, the Debtor prepared a liquidation analysis. The sale of substantially all of the Debtor's assets to Safariland generated approximately $10.3 million in

Cash, which did not cover the $25.05 million Secured Lender Claim. The Debtor's Remaining Assets, including company records, pre-closing accounts receivable, and Causes of Action, remain fully encumbered by the Secured Lenders' Liens.

35. Critically, the GUC Pool of $100,000.00 and the Watts Assets are provided to Holders of General Unsecured Claims and the Watts Claim, respectively, as part of a compromise with the Secured Lenders. The Secured Lenders have agreed to provide these assets from their own Plan consideration and to waive their right to recovery from the GUC Pool, even though their Secured Lender Claim is not fully satisfied by the sale proceeds. Class 3 General Unsecured Claims, estimated at $407,550 to $1,534,915 (including the California Litigation Claim), are projected to receive a recovery of approximately 6.5% to 24.5% from the GUC Pool. The Watts Stipulation removes an approximately $1.43 million Claim from the GUC Pool, thereby increasing the amount available to other Holders of General Unsecured Claims.

36. In a chapter 7 liquidation, no such compromise with the Secured Lenders would exist. All Remaining Assets would be distributed to cover the debtor's administrative expenses, priority claims, and to the Secured Lenders on account of their Liens, and the Holders of General Unsecured Claims would receive nothing. A chapter 7 liquidation would also result in additional administrative expenses, including chapter 7 trustee fees. I believe that each Holder of a Claim or Interest in an Impaired Class will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount the Holder would receive or retain if the Debtor were liquidated under chapter 7. The Plan therefore satisfies the best-interests test under section 1129(a)(7) of the Bankruptcy Code.

### I. The Plan is Confirmable Notwithstanding Section 1129(a)(8) of the Bankruptcy Code.

37. It is my understanding that Classes 2, 3, and 4 voted to accept the Plan. Classes 1 and 5 are Unimpaired and deemed to have accepted the Plan. Consequently, section 1129(a)(8) of the Bankruptcy Code has been satisfied. To the extent that an Impaired Class does not accept the Plan, the Debtor has requested confirmation under section 1129(b) pursuant to the Plan, as discussed below.

### J. The Plan Provides for the Payment in Full of Administrative, Professional Fee, and Priority Claims (Section 1129(a)(9) of the Bankruptcy Code).

38. I understand that Article III of the Plan provides the treatment required by section 1129(a)(9) for Administrative Expense Claims, DIP Claims, Priority Tax Claims, Professional Fee Claims, and statutory fees due under 28 U.S.C. § 1930. Except to the extent a Holder agrees to different treatment, Allowed Administrative Expense Claims and Allowed Priority Tax Claims will be paid in Cash in accordance with the Plan, and Professional Fee Claims will be paid to the extent allowed by the Bankruptcy Court.

### K. The Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code.

39. I understand that section 1129(a)(10) requires at least one Impaired Class to accept the Plan, determined without including any acceptance by an insider. Class 2 (Secured Lender Claim) Holders are insiders, and accordingly their votes cannot be counted for purposes of section 1129(a)(10). Both Class 3 (General Unsecured Claims) and Class 4 (Watts Claim) voted to accept the Plan without counting any insider votes. Accordingly, the requirement of section 1129(a)(10) has been satisfied.

**L. The Plan Satisfies the Feasibility Requirement of the Bankruptcy Code (Section 1129(a)(11) of the Bankruptcy Code).**

40. I believe the Debtor will be able to meet its obligations under the Plan and that confirmation is not likely to be followed by further liquidation or the need for further financial reorganization. The Plan specifically provides for the liquidation and Wind Down of the Debtor from and after the Effective Date. Substantially all of the Debtor's operating assets have already been sold to Safariland, and the Liquidating Debtor will have sufficient Remaining Assets, funded by the Wind Down Amount, to administer the Wind Down. I believe the Plan is feasible because it provides for the funding of the Wind Down Amount before distributions are made to the Debtor's Secured Lenders, which will allow the Debtor to meet its post-Effective Date obligations to pay for the ongoing costs of administering and consummating the Plan and ultimately closing the Chapter 11 Case.

41. The Debtor filed a Wind Down Budget as Exhibit C to the [Plan Supplement.] The Debtor worked with its Secured Lenders to prepare the Wind Down Budget for the Plan. The Debtor expects to have sufficient funds to administer and consummate the Plan, including funding all payments required under the Plan, and proceed with an orderly wind down of the Chapter 11 Case. As of the date hereof, Debtor estimates that the value of its remaining cash sources is approximately $12,487,360.00 (inclusive of true-up amounts owed to Safariland pursuant to the Sale Order).

42. The Debtor projects wind down expenses of approximately $1,303,000.00, including remaining operating expenses, professional fees, other non-operating expenses (including taxes, insurance, U.S. Trustee fees, and Wind Down Officer related costs), and a wind down contingency reserve. The Debtor projects that the total amount that needs to be reserved for outstanding claims that need to be paid on the Effective Date will be approximately

$11,184,360.00. To account for potential variance, the Wind Down Budget includes a contingency reserve amount of $50,000.00.

43. As Wind Down Officer, I will have the authority and funding necessary to reconcile Claims, make distributions, retain professionals, maintain books and records, address tax obligations, and ultimately close the Chapter 11 Case. These funding sources and management arrangements provide adequate and appropriate means for implementation.

44. Based on the above, I believe the Plan is feasible and satisfies section 1129(a)(11) of the Bankruptcy Code.

**M. The Plan Provides for the Payment of Statutory Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12) of the Bankruptcy Code).**

45. I understand that the Plan provides that all fees due and payable under 28 U.S.C. § 1930 before the Effective Date will be paid on the Effective Date or as soon as reasonably practicable thereafter. Post-Confirmation fees will be paid as they become due until the Chapter 11 Case is closed. I believe the Debtor has adequate means to make these payments.

**N. Sections 1129(a)(13)-(16) of the Bankruptcy Code Are Not Applicable to the Plan.**

46. I understand that the Debtor does not provide retiree benefits within the meaning of section 1114(a) of the Bankruptcy Code, is not required to pay domestic support obligations, is not an individual, and is not a nonprofit corporation or trust. Accordingly, sections 1129(a)(13) through (a)(16) are inapplicable to the Plan.

**O. The Plan Satisfies the Cramdown Requirements (Section 1129(b) of the Bankruptcy Code).**

47. It is my understanding that all Impaired Classes have voted to accept the Plan, and no Class has voted to reject or is deemed to reject the Plan. Accordingly, the cramdown provisions of section 1129(b) are not implicated in this Chapter 11 Case. However, even if an Impaired Class

did not accept the Plan, the Debtor has reserved the right to seek confirmation under section 1129(b). I believe the Plan does not unfairly discriminate and is fair and equitable with respect to each Impaired Class and therefore would satisfy the cramdown requirements of section 1129(b) of the Bankruptcy Code if applicable.

**P. Section 1129(c) is Inapplicable to the Plan.**

48. The Plan is the only Chapter 11 plan proposed in this Chapter 11 Case. Accordingly, I believe section 1129(c) of the Bankruptcy Code is not applicable to the Plan.

## IV. ADVERSE CONSEQUENCES OF NON-CONFIRMATION OF THE PLAN

49. If the Plan is not confirmed in the near term, I believe it is unlikely that the Debtor will be able to provide the same recoveries to its creditors as are contemplated by the Plan. Non-confirmation would prolong this Chapter 11 Case, require the continued payment of professional and administrative expenses, and increase the risk of conversion of this Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

50. Critically, the GUC Pool and the Watts Assets are available to Holders of General Unsecured Claims and the Watts Claim, respectively, solely as a product of the compromise with the Secured Lenders embodied in the Plan. In a chapter 7 liquidation, no such compromise would exist. The Secured Lenders' Liens encumber the Remaining Assets, and a chapter 7 trustee would be obligated to distribute those assets to the Secured Lenders on account of their Claims. The Holders of General Unsecured Claims would receive nothing. In addition, a chapter 7 liquidation would result in additional administrative expenses, including chapter 7 trustee fees, further reducing the assets available for distribution.

51. I believe the Plan is in the best interests of the Debtor, its Estate, and its creditors. Accordingly, I believe it is imperative that the Plan be confirmed so that the Debtor may complete

the Wind Down in an orderly fashion, make distributions to creditors as provided in the Plan, and close this Chapter 11 Case in accordance with the Bankruptcy Code.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 3, 2026

By: */s/ Kevin Dooley*
Kevin Dooley
Chief Administrative Officer
Tedder Industries, LLC